SECURITY TRUST COMPANY, a Corporation, ex rel. Dages I. Boyle, Shareholder, Appellant,

v.

E. S. DABNEY et al., Appellees.

Court of Appeals of Kentucky.

June 21, 1963.

Rehearing Denied Dec. 13, 1963.

Frank S. Ginocchio, Lexington, for appellant.

Stoll, Keenon & Park, Harbison, Kessinger, Lisle & Bush, Lexington, for appellees.

PALMORE, Judge.

On January 10, 1961, pursuant to a resolution theretofore adopted by its board of directors, the shareholders of Security Trust Company, of Lexington, Kentucky, a state banking and trust company under KRS Chapter 287, approved an agreement of consolidation with First National Bank and Trust Company of Lexington. Seven days prior to this action one of Security's shareholders, D. I. Boyle, acting derivatively (KRS 271.605) for and in the name of Security, brought suit against its officers and directors and against First National, demanding that the agreement and proposed consolidation be adjudged unlawful and the defendant officers and directors of Security be required personally to indemnify plaintiff against a loss of $360,000 (later amended to $650,000) which, through the proposed exchange for shares in the re-organized First Security National Bank and Trust Company of Lexington, allegedly would result to some 12,000 shares of Security's own stock held by it in its various fiduciary capacities.

The trial court sustained defendants' motions to dismiss the complaint (as twice

amended after the shareholders' meeting of January 10, 1961) and, plaintiff having declined to plead further, entered judgment accordingly. Plaintiff appeals.

■ As the terminology of KRS 271.605 implies,[1] a stockholder's derivative suit must state a cause of action existing in favor of the corporate entity itself. 13 Fletcher, Cyclopedia of Corporations, § 559, p. 1274; Louisville Bridge Co. v. Dodd, 27 Ky.Law Rep. 454, 85 S.W. 683 (1905). The wrongful act for which a derivative suit will lie may be "(1) an ultra vires or illegal act of the corporate officers or of majority stockholders, (2) a fraudulent or unfair act of the corporate officers or majority stockholders, or (3) the wrongful act of a third person." 13 Fletcher, Cyclopedia of Corporations, § 5951, p. 439. "Stockholders' suits are especially important as a remedy for minority stockholders to call directors and controlling stockholders to account for mismanagement and fraudulent manipulation. In most cases there is a corporate right of action, but in some situations both an individual and a corporate right may arise." Id., § 5941, p. 413.

"While an injury to the corporation resulting from wrongdoing, fraud or negligence of corporate officers operates, indirectly, as an injury to stockholders, the injury to stockholders is secondary and the injury to the corporation primary. A stockholder cannot, as an individual as distinguished from a representative of the corporation, sue directors or other corporate officers for mismanagement, negligence or the like, on a cause of action which belongs to the corporation. * * * He cannot sue to set aside a contract made in fraud upon corporate rights. * * * Improper manipulation of funds by the controlling stockholder creates a cause of action in favor of the corporation rather than in favor of a stockholder as an individual, as does a

wrongful diversion of corporate assets." Id., § 5924, pp. 395–396.

KRS 271.605 provides that a stockholder's complaint to enforce secondary rights shall "set forth with particularity the effort of such shareholder or shareholders to secure from the directors and, if necessary, from the other shareholders the desired action, and the reasons for failure to obtain such action or the reasons for not making such effort to obtain such action." This requirement appears to have been taken from Rule 23(b) of the Federal Rules of Civil Procedure, which in turn is an enlargement of old Equity Rule 27. Cf. 3 Moore's Federal Practice, R. 23, p. 3489 et seq.

With these fundamentals in mind, we shall first take up appellee's contentions that (1) a stockholder's derivative suit will not lie in this case, and (2) in any event the proceeding must fail because the complaining stockholder made no effort to secure the desired action within the corporation itself, through the other shareholders, before bringing suit.

According to the contract between the two banks, in round figures and subject to certain adjustments Security's 40,000 shares of stock outstanding had an estimated fair value of $4 million and First National's 100,000 shares $6 million, on which basis the 200,000 shares to be issued by the reorganized company in exchange therefor would be divided 80,000 to Security's and 120,000 to First National's stockholders. The assets contributed by the respective parties were to be passed on and be acceptable to a committee of six, three appointed by each board of directors. The plan was proposed pursuant to the procedures set forth in 12 U.S.C.A. § 215, requiring approval of the Comptroller of Currency, and to § 368 of the Internal Revenue Code as a tax-free reorganization. Until the next annual meeting, the new bank would be governed by a board of 15 named

1. "In a suit brought to enforce a secondary right on the part of one or more shareholders of a corporation, because the corporation has refused to enforce rights *which may properly be asserted by it*," etc. (Emphasis added.)

directors, six of whom were members of Security's board. Those of Security's directors not so named were to serve as "advisory directors" until the next annual meeting.

After pleading the contract as an exhibit, the complaint launches a barrage of conglomerated charges, some of which, if true, would more appropriately serve as the basis for individual rather than corporate relief, some of which go strictly to the question of business judgment and, standing alone, would not provide a cause of action of any sort, and some of which actually do sound in the area of mismanagement, which is a proper subject of derivative relief. Shorn of conclusions and uncomplimentary adjectives, the factual content of the complaint and amended complaints may be categorized as follows:

A. The transaction is tainted with self-interest on the part of Security's directors, in that they are designated as members or advisory members of the new board of directors until the first annual meeting of shareholders.

B. It is a bad business deal for Security's stockholders and trust accounts. This is the net effect of charges that (1) Security's power and prestige will be dissipated through loss of identity into and absorption by the new and larger association, (2) Security's stockholders will be reduced from 100% to 40% ownership and, without good reason for such a move, will lose managerial control, (3) the new stock to be received in exchange will have less value than Security's old shares, a circumstance resulting wholly or in part from the fact that the "fair value" of Security's stock is substantially in excess of the amount at which it is valued in the contract and the further fact that the fair value of First National's stock, as established by the contract, included an item of $400,000 for good will, whereas nothing is allowed to Security for good will, and (4) by virtue of the consolidation Security's stock, including that which is held

in its trust accounts, will become subject to First National's liabilities.

By the first amended complaint it is alleged that the fair value of Security's stock held in its fiduciary capacity is $660,000 (instead of $360,000 as set forth in the complaint) more than the amount agreed upon in the contract, the larger value having been established by a bona fide offer to purchase such stock.

C. The initial board of the re-organized company will be constituted by contract rather than by election, depriving the shareholders of their statutory right of cumulative voting. Cf. Const. § 207.

D. The first amendment of the complaint alleges that at the stockholders' meeting on January 10, 1961, the vote was counted as 31,688 shares for and 7300 shares against the proposal. Of the 31,688 majority vote 9,347 were shares held by Security and 812 by First National in their respective trust accounts. (Elimination of the trustee stock would reduce the favorable vote to less than the required two-thirds.)

E. The second amended complaint sets forth a provision of 12 U.S.C.A. § 61 to the effect that no officer, clerk, teller or bookkeeper of a national bank shall act as proxy in voting its shares, and alleges that of the 31,688 votes in favor of the proposal 18,774 shares were voted by Security's officers as proxies.

Deferring for the moment the question of whether, on the merits, the complaint as amended states a cause of action, we have no difficulty in concluding that from a technical standpoint the principal type of relief demanded—a declaration that the plan cannot lawfully be consummated—is the proper subject of a derivative action, because the focal issues are, in substance, whether the questioned actions are ultra vires and whether they reflect mismanagement and self-dealing to the detriment of the corporation and in breach of the fidelity owed by its officers and directors to the stockholders. (Since, however, we have concluded also

that on the merits the facts do not warrant such relief, it is unnecessary to consider the propriety of the demand that the individual officers and directors be required to indemnify against loss in value of its trustee stock.)

■ In Ashwander v. Tennessee Valley Authority, 297 U.S. 288, 56 S.Ct. 466, 80 L.Ed. 688 (1936), it was held that stockholders who had sought unsuccessfully to have a corporation extricate itself from an allegedly illegal contract could maintain a derivative action against the directors and the other contracting party to annul the contract. In a separate concurring opinion Mr. Justice Brandeis took issue with this particular aspect of the majority opinion, pointing out that since a corporation would be estopped from contesting the validity of its own contract,[2] so should a shareholder suing in the corporate right. However that may be, we think that where the other contracting party is on notice before the agreement becomes final and binding, and proceeds nevertheless to conclude it, he could not thereafter defeat a derivative action by the disgruntled stockholders on the technical ground that the corporation cannot contest its own contract. In such a case the derivative action, if successful, would have the effect of proving that the contract was not the authorized act of the corporation.

■ The opinion of a federal district court in Sobel v. Whittier Corp., D.C.Mich., 95 F.Supp. 643 (1951), holding that a stockholders' derivative suit to prevent a corporate merger will not lie is not supported by the text therein quoted as authority. The excerpt from General Inv. Co. v. Lake Shore & M. S. Ry. Co., 6 Cir., 250 F. 160, 174, says merely that F.R.C.P. 23(b)[3] "has no application to a suit brought by a stockholder against the corporation seeking, *in*

*his own direct right,* to enjoin it from doing an illegal act." (Emphasis added.) The quotation from Moore's Federal Practice (Vol. 3, R. 23, pp. 3508–3509) states specifically that actions "to enjoin those in charge of the corporation from causing it to commit an ultra vires act" are within the rule and, in referring to injunctive proceedings against a proposed merger or consolidation, says that they are not so *"where a shareholder sues on behalf of himself and all others similarly situated."*[4] (Emphasis added.) Certainly these authorities do not support the proposition that a contract of merger or consolidation cannot be enjoined or rescinded by a stockholders' derivative action, and we hold that it can.

■ With respect to compliance with KRS 271.605, the complaint alleged that it would have been futile for the relator Boyle to request appropriate action by the defendant officers and directors. His failure to make any allegation with respect to the other stockholders of Security may have been fatal to the complaint in the beginning, but we think the defect was cured by the amended complaint showing that in spite of the pendency of this action the other stockholders had voted to approve and carry out the proposed consolidation. Surely this development provided clear enough indication that an effort to secure annulment of proceedings through direct corporate action would be useless.

We come now to the practical merits of this lawsuit, which will be discussed by reference to the five categories into which the allegations of the complaint have been heretofore classified in this opinion.

■ A. It is clear from the face of the complaint that the alleged self-interest on the part of Security's directors lies entirely in the fact that pursuant to the contract

---

2. See Wilson v. Louisville Trust Co., 242 Ky. 432, 46 S.W.2d 767, 770 (1932). There is, of course, no plea of estoppel in this case.

3. The rule, from which our KRS 271.605 is taken, making demand upon the direc-

tors and other shareholders a condition precedent to maintenance of a derivative action.

4. This would, of course, be a representative or class action to enforce primary rights of the shareholders.

some of them will have directorships, and others advisory directorships, on the board of the reorganized company.

In Seagrave Corp. v. Mount, 6 Cir., 212 F.2d 389 (1954), a stockholders' derivative suit to enjoin a proposed consolidation was sustained because of a side agreement (which was, however, disclosed in the prospectus) whereby the stock of two of the directors would be purchased for substantially more than its value on the stock exchange, more than other stockholders would or could obtain for their shares, and a further understanding on the part of three other directors that they would be retained in their positions as managing officers of the company, positions on which they had a precarious hold because of dissension with the majority group whose interests were being bought out incident to the proposed consolidation.

We have here no such situation as existed in the Seagrave case. No one's stock is being bought at a premium, and there is no hint of any threatened removal from office which might be eliminated by the merger, thus tainting with self-interest the discretion of the affected directors.[5] To make a long story short, we do not believe that the mere obtention of a directorship on the board following merger or consolidation creates a disqualifying self-interest. Were it so, many a merger would be impossible. Usually such an arrangement is considered indispensable to the interests of the respective corporations, both old and new. In the absence of special circumstances indicating otherwise, we presume that to be the case in this instance.

■■  B. All of the allegations in category B address themselves to the matter of business judgment. Absent fraud, actual or constructive, the courts will not interfere with the management of a private corporation. Carter v. Louisville Ry. Co., 238 Ky. 42, 36 S.W.2d 836, 838 (1931); Venus Oil

Corporation v. Gardner, 244 Ky. 176, 50 S.W.2d 537 (1932). If, as contended, Security's trust accounts will suffer loss through wrongful imprudence, this suit does not abridge or affect any redress to which the beneficiaries of the various trusts may be entitled.

■  C. That the directors serving until the first annual meeting of the re-organized company will serve by contract rather then election is a reasonably necessary incident of the merger. As in the case of category A, such an arrangement would generally be considered vital to an orderly transition, outweighing the very temporary and technical suspension of cumulative voting rights.

■  D. The voting by Security of its shares held in trust is upheld in Graves v. Security Trust Company, Ky., 369 S.W.2d 114, decided today. Again, in the absence of fraud or other special circumstances (such as a real and substantial self-interest), we see no reason why a corporation should not be permitted to vote shares of its own stock legally held by it in a fiduciary capacity.

■  E. 12 U.S.C.A. § 61 does not apply to state banks. Security was a state bank and a separate entity from First National at the time of its stockholders' meeting on January 10, 1961. Our statutes contained no provision disqualifying its officers from acting as proxies.

■  Concluding now with the procedural disposition of this case by the trial court, the appellant relator contends, in effect, that on the basis of his charges of self-dealing and unfair manipulation to the detriment of the corporation and its cestuis que trustent he has the right to prove facts not specifically set forth in the complaint and, therefore, even if the pleaded facts do not disclose a cause of action his complaint is good against a motion to dismiss.

---

5. Indeed, the term "side agreement" is ill-used by appellant, since the arrangement is set forth in the body of the contract proposing the plan of re-organization.

It is, of course, elementary that under the Civil Rules a complaint need only give fair notice of a cause of action and the relief sought. Clay, 6 Kentucky Practice, Rule 8.01, Note 3 et seq. But still it must disclose a cause of action. The complaint in this case, as amended, makes it perfectly clear that the pleader has said all he has to say, that he has, as it were, shot his bolt. He approaches a cause of action only in the allegations of self-interest on the part of the directors, and in this respect the fair import of the complaint is that the directorships on the re-organized board are the sole and particular basis for those allegations. Where a plaintiff chooses to state his complaint in full detail, in lieu of the simple form sufficient under the Civil Rules, and neither its contents nor the inferences reasonably to be drawn from them will support his claim for relief, a motion to dismiss serves substantially the same purpose as a motion for summary judgment and should be sustained. It is our opinion that the trial court did not err in this respect.

The judgment is affirmed.