## Urban J. Alexander Co. v. Trinkle et al.

December 2, 1949.

636

Mortimer Viser, Davis, Boehl and Viser & Marcus for appellant.

L. R. Curtis, Curtis & Curtis, Edward A. Dodd and Dodd & Dodd for appellees.

STANLEY, COMMISSIONER—Affirming.

This suit is by a corporation, Urban J. Alexander Company, against a former officer and employee for an accounting and recovery of a substantial sum of money alleged to have been made and appropriated to the defendant's personal use but which should inure to the company by reason of a breach of fiducial relations.

The corporation was organized in 1932 by Urban J. Alexander to engage in the investment and brokerage business. The company dealt principally with local promotions and securities. Its charter also authorized the buying and selling of securities and real estate and all things convenient and necessary in connection with such business. The capital authorized was $7,000, divided into 7,000 shares of $1.00 par value. Alexander eventually received 5,000 shares but assigned three shares each to two other persons to qualify them as directors. The holders of these qualifying shares changed, but the outstanding stock remained the same. Walter Trin-

kle was employed as a salesman for the company in 1933. It was understood that he would devote all his time to the business of the company except, according to Alexander, upon his special approval or consent. In December, 1937, Trinkle became one of the qualifying stockholders, a director and vice president of the company. He continued the relationship of a salesman, receiving, as his compensation, 50% of the commissions on business he produced. Up until November, 1941, the corporation was but the alter ego of Alexander. At that time Trinkle acquired 1,500 and Alexander the balance of remaining unissued 2,000 shares of stock.

It appears that the company was undercapitalized and was in some difficulty with the state director of securities. In September, 1942, when the company was in a precarious financial condition, Alexander went to work for the War Production Board, but continued as president of the company and to reside in Louisville. It was agreed that Trinkle should continue as a salesman and should also assume the management of the business. In addition to his 50% of the commissions earned, he received $100 per month salary because of his increased duties and responsibilities. This was later changed to one-half the net profits of the company. Trinkle built up the company so that when Alexander returned to it on June 1, 1945, it was as of good a standing as it had ever been; but this did not much exceed $5,000 in assets. It was during this period that the transactions upon which the suit is based occurred. Perhaps it was in process of final completion when Alexander returned to take charge of the business, at which time Trinkle and Monroe severed their connection. The defendant, Herman F. Monroe, had been with the company as a salesman since 1937 on a commission basis. He was never an officer of the company. It was understood that he did not have to devote all his time to its affairs.

The transaction by Trinkle and Monroe, which resulted in a profit to them and which the company claims inured to it, less commissions, was in the acquisition and disposition of stock and property of The Independent Ice and Coal Company. The amount was around $30,000, or $40,000, there being a disagreement as to the amount.

In July, 1943, Trinkle secured a sixty day option in his own name as exclusive agent to sell all the capital stock of The Independent Company. He diligently tried to find a purchaser but was unsuccessful and his authority lapsed. He concedes that the Alexander Company would have been entitled to 50% of the commissions if he had succeeded in making the sale. About a year later Monroe put Trinkle in touch with Joseph Hofgesang, a capitalist with experience in the contracting and salvaging business. Thereupon Trinkle obtained another option from the owners of all the Independent stock to sell it on commission or to buy it himself or for the account of himself and others for $375.00 a share net. Hofgesang declined to purchase the stock alone because of his inexperience in the field of securities. He agreed to enter into the transaction only on the basis of a partnership which would include Trinkle since he was experienced in that line. It was agreed in writing that if the stock should not be sold to others by their joint efforts before the expiration of the option, the partnership would buy the stock, dispose of the assets or, if necessary, operate the plant. Hofgesang agreed to furnish all necessary capital. The proceeds would be shared but any loss would be borne by Hofgesang. This instrument of joint adventure is dated August 10, 1944. In September, 1944, Hofgesang, his wife, Trinkle and Monroe, as partners, bought the stock of the Independent Company for $300,000. The respective interests were: Hofgesang and wife, 50%; Trinkle, 40%; and Monroe, 10%. The partnership borrowed $300,000 from the First National Bank, purchased the stock, which, with the assets of the company, was pledged with a trustee as security for the loan. The partners proceeded to liquidate the assets. The sale of the land was handled through the Alexander Company and it received its proper share of the commissions. No purchaser could be found for the ice plant machinery, and the parties set about to salvage it for therein lay their profit. This was done by buying the capital stock of the Parkland Ice and Coal Company for $88,000 in a manner similar to the purchase of the Independent Company stock. The machinery of the Independent Company was then moved to the premises of the other and the whole works sold at a loss of about $8,000. The two transactions were treated separately

for tax purposes but upon the series the partners realized a profit of approximately $80,000. It is the plaintiff's claim that it is entitled to fifty per cent of the profit received by Trinkle and Monroe. They claim this was an outside venture and they violated no duty or obligation to the brokerage company.

Here it may be noted that several brokers testified in answer to a hypothetical question that, according to the customs, usages and practices of similar brokerage and investment companies, these transactions should be regarded as company business. However, the question did not embrace the conditions which the defendants proved and upon which they were relying, as above outlined.

The defendants' contentions rest upon several grounds. One is that the corporation's charter debt limit was $250,000 and it was necessary that $300,000 be borrowed to "swing the deal;" and even if that limitation had not been in the way, the company owned practically no assets and its credit position was not such that it could have financed the purchase. Another is that the corporation could not legally enter into a partnership such as Hofgesang insisted upon. Ordinarily that is so, but there are some qualifications. 13 Am. Jur., Corporations, Secs. 823, 824; Commonwealth v. United Warehouse Company, 293 Ky. 502, 169 S. W. 2d 300. Another contention is that there had been a series of transactions by Mr. Alexander personally which could be regarded as within the general powers of the corporation, and he had not treated them as company business or shared the profits. These transactions, including the fact that Alexander did not share with the company the salary which he received from the federal agency, it is submitted, evidence a contemporaneous construction of the indefinite, verbal contract or understanding of their respective relations to the corporation, that such outside activity was acquiesced in by the corporation; and Alexander, the only other real stockholder, is in no position to complain because Trinkle and Monroe did the same thing. The conclusion reached makes it needless to consider the two latter points.

It is statutory law that a director or managing officer has a fiducial relation to the corporation and

its stockholders. KRS 271.365. It is well settled by a long train of decisions that he has the duty to act in the utmost good faith and to further the corporation's interest and business. He may not, therefore, acquire an interest in property adverse to that of the corporation or enter into a contract to serve his own interests or to assume a position which will bring his private interests into conflict or competition with that of his company. If he does so, he may be required to account for profits made in the transaction by reason of the breach of the trust relationship. This is a very emphatic rule where an undue advantage is secured at the expense of the corporation. Jasper v. Appalachian Gas Co., 152 Ky. 68, 153 S. W. 50, Ann. Cas. 1915B, 192; Coleman v. Hanger, 210 Ky. 309, 275 S. W. 784; Hoge v. Kentucky River Coal Corporation, 216 Ky 51, 287 S. W. 226.

However, a director or officer of a corporation is not by reason of his fiduciary relation precluded from entering into and engaging in a business enterprise which is independent of, though similar to, that conducted by the corporation itself, provided in doing so the officer acts in good faith and does not interfere with the business enjoyed by the corporation. 13 Am. Jur., Corporations, 999; Coleman v. Hanger, supra, 210 Ky. 309, 275 S. W. 784. We think Trinkle manifested his good faith in his diligent efforts to sell the Independent Company stock as agent of the owners.

It is laid down in Fletcher, Cyclopedia of the Law of Private Corporations, Section 862, that the test of an officer's right to engage in an outside individual activity, though it is within the general scope of the corporation's business, is whether there was a specific duty to act or to contract in regard to the particular matter as the representative of the corporation, which, it is stated, is a question of fact. It is further said in Section 862.1 of that text upon authority of several cases from jurisdictions other than Kentucky that:

"A business opportunity ceases to be a 'corporate opportunity' and becomes 'personal' when the corporation is definitely no longer able to avail itself of the opportunity. The inability to avail itself of a business opportunity may arise from financial insolvency, or

from legal restrictions, or from any other factor which prevents it from acting upon the opportunity for its own advantage. A corporation can have no interest of expectancy in transactions extraneous to the corporation's business. Where a corporation declines because of legal barriers, to avail itself of an opportunity, or it is the settled policy of the corporation not to engage in a particular line of business, or it has declined the opportunity for business reasons, or the transaction is beyond the powers of the corporation, or the opportunity is not available to the corporation either because a party refuses to deal with it or because the corporation sought, but without success to obtain it, the opportunity is one in which the corporation has no legitimate interest or expectancy and may be embraced by an officer or director as his own."

It is said in Note, 153 A. L. R. 664, appended to Diedrick v. Helm, 217 Minn. 483, 14 N. W. 2d 913, 153 A. L. R. 649:

"In regard to the question whether activities of a corporate director or officer which are ultra vires the corporation constitute corporate opportunities which the director may not divert to his own advantage, the general rule seems to be that a corporation can have no interest or expectancy of profit in transactions beyond its corporate powers, at least where the acts are malum in se. Consequently, an officer or director of a corporation can engage for himself in any business activity from which the corporation is excluded by legal barriers, since he cannot have been authorized in such a case to act for his corporation."

In Jasper v. Appalachian Gas Co., supra, 152 Ky. 68, 153 S. W. 50, Ann. Cas. 1915B, 192, the general principle was recognized that an officer of an insolvent corporation, who on his own account and for his own purposes engages in a venture similar to that which the corporation might engage in, and makes a profit out of it, is not liable to the corporation for the profit made by him where the corporation was insolvent and incapable of exercising the franchise purchased by him, even if he had done so for its benefit. Of like effect is Lancaster Loose Leaf Tobacco Co. v. Robinson, 199 Ky. 313, 250 S. W. 997, where the president of a corporation on his

own account engaged in a venture having a relation to his company's business but one it had never engaged in before. In the instant case, while the Alexander Company was a going concern, apparently solvent, yet its financial condition and its legal position were not sufficient to enable it to engage in this venture. The difference between this case and the Jasper case is only in degree, for the decisive point there was the incapability of the corporation.

An officer or director has no specific duty to use or to loan his own personal funds to assist the corporation to meet its financial obligations or to enable it to take advantage of a business opportunity. Zeckendorf v. Steinfeld, 12 Ariz. 245, 100 P. 784; Hart v. Bell, 222 Minn. 69, 23 N. W. 2d 375, 24 N. W. 2d 41. It was held in Hoge v. Kentucky River Coal Corporation, supra, 216 Ky. 51, 287 S. W. 226, that it was no defense to a suit against a general manager of a corporation's business that he had used his own money to pay for land he had contracted to buy for the corporation but took title personally, since a resulting trust arose under the circumstances. Here was a clear-cut breach of faith in the performance of the officer's services.

The appellant relies upon the proposition that secret profits are recoverable although they were obtained in a transaction ultra vires the corporation. Memphis & Arkansas City Packet Co. v. Agnew, 132 Tenn. 265, 177 S. W. 949, L. R. A. 1916A, 640. The transaction involved in that case was conducted in the name of the corporation with its funds and equipment and it had been in fact accomplished and all contracts had been performed in the name of the corporation. The officer, it was rightly held, could not plead ultra vires as a defense in the suit for he himself had fraudulently created the situation. There is a material difference in the situation presented by this record. The debt limit stipulated in the articles of incorporation of the Alexander Company was not put there to be violated. It stood as a legal barrier to a transaction that would violate it. Had Trinkle, as an officer, engaged in the ultra vires contract of exceeding the debt limit he may have become personally liable for any loss. KRS 271.020(8), 271.990 (1944 edition); Randolph v. Ballard County Bank, 142 Ky. 145, 134 S. W. 165. It may well be assumed, furthermore,

that no bank would have run the risk of lending money in excess of the company's charter power. See First Nat. Bank v. D. Keefer Milling Co., 95 Ky. 97, 23 S. W. 675; American Southern Nat. Bank v. Smith, 170 Ky. 512, 186 S. W. 482, Ann. Cas. 1918B, 959. It is no answer to say that the Independent Company had a large amount of cash and liquid assets and there would have been no trouble in financing the transaction on that account. We doubt this very much, for there had to be some financial credit before even those assets would have become available as security. Hofgesang furnished that credit. He, Trinkle and Monroe all signed and became obligated on the $300,000 note. Manifesting the inability of the Alexander Company to acquire the stock and property of the Independent Company is the fact it had an opportunity to do so under the first option secured by Trinkle in 1943 and did not even undertake it.

The case of Chambers v. Johnston, 180 Ky. 73, 201 S. W. 488, is relied upon by the appellant with confidence. There is a great similarity to the present state of facts. A member of a partnership brokerage company had made considerable profit by engaging in financial dealings in stocks and bonds. Though the transaction was not exactly similar to any previously engaged in by the partnership, it was deemed to be one in which it might have engaged under the terms of the partnership agreement and was regarded as within the scope of the business. Accordingly, the court held that though the partner had used his own money and had become solely responsible for any loss which might have resulted from the transaction, he must account to his partners for the profits he made. The two prominent features that distinguish that case from the present one are legal incapacity and financial inability of the Alexander corporation to have participated in this venture, conditions not existing in the Chambers case.

Covington & Lexington R. Co. v. Bowler's Heirs, 72 Ky. 468, is also different. It was there held that a director of an insolvent corporation could not individually buy its property at a judicial sale without its consent or the permission of the chancellor ordering the sale. Like the Hoge case, supra, 216 Ky. 51, 287 S. W. 226, the act of the officer related to the property of his corporation.

The case against Herman F. Monroe has an additional factor. He was only an employee, paid commissions on business which he produced for the company and was not required by the terms of his employment to devote all his time to this company.

It seems to us, therefore, the court properly adjudged no liability on the part of the defendant to account for profits made on the integrated transaction, for the acquisition of the Parkland Company was but a means of liquidating the assets of the Independent Company.

The judgment is affirmed.